(Slip Opinion)

# Religious Seasonal Decorations in Federal Government Buildings

The Public Buildings Service of the General Services Administration may, consistent with fiscal law and the First Amendment's Establishment Clause, broaden its policy governing the purchase and display of seasonal decorations in the public spaces of federal properties to allow for the display of religiously significant seasonal decorations that are reasonably calculated to improve employee morale.

January 15, 2021

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

The Public Buildings Service ("PBS") of the General Services Administration ("GSA") maintains a policy governing the purchase and display of seasonal decorations on federal properties under GSA's jurisdiction, custody, or control. The current policy prohibits the purchase or display of any "religiously significant" seasonal decoration in the public spaces of such properties. The policy identifies certain "religiously significant" items, such as a cross, menorah, or crèche, and identifies other items that are not "religiously significant," such as a Christmas tree or Santa Claus. Your office has asked whether these restrictions are compelled by fiscal law or by the First Amendment's Establishment Clause, and whether there are circumstances in which GSA may or must permit the display of "religiously significant" decorations, whether purchased by GSA, other federal agencies, or federal employees. These questions implicate long-standing and long-accepted practices by which the federal government has recognized and accommodated the religious beliefs of the citizenry.

We conclude that GSA may, consistent with fiscal law and the First Amendment, broaden its policy to allow for the display of religiously significant seasonal decorations that are reasonably calculated to improve employee morale. Under applicable fiscal law principles, a modified policy may allow an agency broad discretion to choose decorations believed to contribute to a pleasant workplace atmosphere and to be consistent with agency objectives. Under the Establishment Clause, the display of religiously significant seasonal decorations in federal public buildings is entitled to "a strong presumption of constitutionality." *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2085 (2019). Such dis-

plays are in keeping with our government's tradition of accommodating religious holidays and employing religious symbols. A display would violate the Establishment Clause only if it evinced an actual tendency to establish religion. Absent any indication, however, that the agency coerced religious belief or displayed a systematic preference for a religious faith, the passive display of one or more religiously significant seasonal decorations is unlikely to constitute an establishment of religion. A revised policy should also take care to leave government employees free to engage in religious expression in forums that have been created for speech in the workplace.

## I.

PBS is primarily responsible for providing workspaces for federal agencies. We understand that the current seasonal-decorations policy originated in a 1990 PBS administrative order, *Expenditures for Seasonal Decorations*, ADM Order No. 4200.1A (Dec. 14, 1990).[1] The 1990 policy was in turn based on a 1987 opinion by the General Accounting Office, now the Government Accountability Office ("GAO").[2]

In the 1987 opinion, GAO reversed its then-held view that the purchase of seasonal decorations by federal agencies would violate federal appropriations law. GAO opined instead that the Department of State could lawfully reimburse an employee who purchased holiday decorations for the U.S. embassy in Bonn, West Germany, including poinsettias, menorahs, and Christmas trees. *See Department of State & General Services Administration—Seasonal Decorations*, 67 Comp. Gen. 87 (1987) ("*Seasonal Decorations*"). GAO concluded that a decorative item could be a necessary expense—and thus a permissible use of funds—when it "is

---

[1] Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Jack St. John, General Counsel, General Services Administration (Mar. 12, 2020) ("Opinion Request").

[2] The decisions of the Comptroller General—who heads GAO—are not binding on the Executive Branch, because the Comptroller General is an agent of Congress. *See Comptroller General's Authority to Relieve Disbursing and Certifying Officials from Liability*, 15 Op. O.L.C. 80, 82–83 (1991); *Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986). We do, however, consider GAO opinions "useful sources on appropriations matters." *Authority of the Environmental Protection Agency to Hold Employees Liable for Negligent Loss, Damage, or Destruction of Government Personal Property*, 32 Op. O.L.C. 79, 85 n.5 (2008).

consistent with work-related objectives and the agency mission, and is not primarily for the personal convenience or personal satisfaction of a government employee." *Id*. at 88. The 1987 opinion distinguished the embassy's seasonal decorations from practices like "sending Christmas cards on behalf of certain agency officials at public expense," which were "basically individual good will gestures" and "not part of a general effort to improve the work environment." *Id*. at 89 (citing *Appropriations—Availability—Christmas Cards*, 64 Comp. Gen. 382 (1985)). GAO cautioned that the display of "religious symbols" might raise Establishment Clause questions. *Id*. But it noted that the Supreme Court in *Lynch v. Donnelly*, 465 U.S. 668 (1984), had upheld a municipality's display of a crèche against constitutional challenge. 67 Comp Gen. at 89 & n.1.[3] GAO did not conclude that the reimbursement request would be unlawful under the Establishment Clause.

Consistent with GAO's decision, the 1990 policy generally authorized the purchase of seasonal decorations. ADM Order No. 4200.1A, at 1. But the policy categorically prohibited the purchase of "[s]easonal decorations religious in nature, such as menorah candelabra or Nativity crèches."[4] *Id*. In 1993, PBS issued a superseding policy, *Expenditures for Seasonal Decorations*, OAD Order No. 4200.1 (Dec. 9, 1993), which maintained that restriction on religious seasonal decorations.

In 2018, PBS promulgated its current seasonal-decorations policy. *Seasonal Decorations*, PBS Order No. 4200.2 (Dec. 26, 2018). The policy allows the use of federal funds to purchase seasonal decorations that are "not religiously significant in nature" for display in public areas of federal buildings. *Id.* at 2. The policy also includes a non-exclusive list of items deemed not "primarily" religiously significant, including a Christmas tree, a dreidel, a wreath, a reindeer, tinsel, Santa Claus, a snowman, and poin-

---

[3] A crèche, or nativity scene, typically depicts the new-born Jesus Christ in the manger, sometimes surrounded by barn animals, the Magi, and the shepherds mentioned in the gospels. *See Skoros v. City of New York*, 437 F.3d 1, 4 n.1 (2d Cir. 2006).

[4] A Chanukah menorah is a candelabra with eight candles, plus a ninth used to light the others, which commemorates the Maccabees' rededication of the Old Temple in Jerusalem, following their successful revolt against the Seleucid Empire in the second century B.C., during which a limited supply of oil was viewed as having miraculously burned for eight nights. *See County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573, 582–85 (1989).

settias. *Id.*[5] The policy explains that these items "typify the secular celebration of the holiday season" and may be purchased. *Id.* The PBS policy, however, continues to bar the use of funds "to purchase seasonal decorations that are religiously significant in nature," including a menorah, a cross, and a crèche. *Id.* at 1–2. Such decorations "could be viewed as an endorsement of religion lacking any clearly secular purpose," and thus "may not be purchased with PBS funds or displayed in the public spaces of federally owned and leased buildings under GSA's jurisdiction, custody or control." *Id.* at 1. In directing that "such decorations must not be displayed in public areas of buildings," *id.*, the policy appears to prohibit *any* display of a religiously significant decoration—even if the display comes at an employee's personal expense.

## II.

We begin with the question of whether GSA may, consistent with fiscal law, expand its policy to permit the purchase of "religiously significant" decorations for display in federal buildings, or to permit federal employees to donate such decorations. We conclude that it may.

## A.

Since 1987, GAO has recognized that an agency may use appropriations otherwise generally available for building improvements to purchase seasonal decorations if the decorations are "consistent with work-related objectives and the agency mission" and are "not primarily for the personal convenience or personal satisfaction of a government employee." *Seasonal Decorations*, 67 Comp. Gen. at 88. We agree with that conclusion and believe it justifies the purchase of religiously significant seasonal decorations as well.

The principle of appropriations law at work here is the so-called "necessary-expense" doctrine. Under the Purpose Act, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). But agencies "have considerable discretion in determining whether expenditures further the agency's authorized purposes and therefore constitute proper use of

---

[5] The policy shifts between referring to decorations that are "not religiously significant in nature" and "not *primarily* religiously significant in nature" (emphasis added).

general or lump-sum appropriations." *Use of General Agency Appropriations to Purchase Employee Business Cards*, 21 Op. O.L.C. 150, 153 (1997). The necessary-expense doctrine permits an agency to spend from a general appropriation "'[i]f the agency believes that the expenditure bears a logical relationship to the objectives of the general appropriation, and will make a direct contribution to the agency's mission.'" *Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. __, at *6 (Jan. 18, 2017) (quoting *Indemnification of Department of Justice Employees*, 10 Op. O.L.C. 6, 8 (1986)); *see generally* GAO, *Principles of Federal Appropriations Law* 3-14 to 3-25 (4th ed. 2017) ("Red Book 4th").

We agree with GAO that the necessary-expense doctrine allows for the purchase of seasonal decorations using the Federal Buildings Fund if "the purchase is consistent with work-related objectives, agency or other applicable regulations, and the agency mission, and is not primarily for the personal convenience or satisfaction of a government employee." *Seasonal Decorations*, 67 Comp. Gen. at 88. The Federal Buildings Fund, which is administered by PBS, is "available for real property management and related activities in the amounts specified in annual appropriations laws without regard to fiscal year limitations." 40 U.S.C. § 592(c)(1). For fiscal year 2020, Congress made this fund "available for necessary expenses of real property management and related activities not otherwise provided for," including "operation" and "maintenance" of "federally owned and leased buildings." Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, div. C, tit. V, 133 Stat. 2317, 2464 (Dec. 20, 2019). That treatment continued in the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, div. E, tit. V, 134 Stat. 1182 (Dec. 27, 2020). Regulations have long allowed such funds to "be expended for pictures, objects of art, plants, or flowers (both artificial and real), or any other similar type items," as long as the decorations are not "intended solely for the personal convenience or to satisfy the personal desire of an official or employee." 41 C.F.R. § 101-26.103-2.

The purchase of seasonal decorations "in public areas where they would contribute to a pleasant working atmosphere," *Seasonal Decorations*, 67 Comp. Gen. at 88, is a logical extension of the necessary-expense doctrine. Like more lasting features of an office space (such as a new desk or wall hangings), such decorations may be reasonably related to agency

objectives because they tend to "improv[e] morale and efficiency." *Id.* They are therefore reasonably incidental to the general appropriation for operating buildings, which was enacted against the backdrop of a long-standing regulation providing for the payment of decorative expenses. We do not see any categorical difference as a matter of fiscal law between religiously significant seasonal decorations and other kinds of decorations. Both types may "contribute to a pleasant working atmosphere." *Id.*

Your office has not asked us to review any particular proposed display, and whether a particular seasonal decoration reasonably advances these purposes will turn on the facts, as well as any other agency-specific statutes that may apply. The agency itself "will have to make the required determination," *State and Local Deputation of Federal Law Enforcement Officers During Stafford Act Deployments*, 36 Op. O.L.C. 77, 90 (2012), since it is "'in the best position to determine whether' an expenditure of funds is necessary to carry out the agency's mission effectively," *id.* (quoting *Customs and Border Protection—Relocation Expenses*, B-306748, 2006 WL 1985415, at *3 (Comp. Gen. July 6, 2006)); *see also* Red Book 4th at 3-15 ("[T]he determination must be made essentially on a case-by-case basis."). Generally speaking, though, we believe that an agency will have discretion under the necessary-expense doctrine to permit the purchase of religiously significant seasonal decorations where it deems them to contribute to these purposes.

## B.

Your office has also asked whether GSA "may or must permit the display of religiously significant decorations" that are "purchased . . . by an employee with the employee's own funds." Opinion Request at 3. This question implicates different authorities than when an agency itself wishes to pay for seasonal decorations. If an employee chooses to decorate a private workspace—such as in the employee's personal office—it is doubtful that a fiscal law question would even arise. But if an employee-provided decoration substituted for a decoration that an agency might otherwise purchase with appropriated funds, then the private donation of such a decoration to an agency might be considered a gift.

Although an agency may only accept gifts as authorized by statute, GSA, including PBS, has specific statutory authority to accept "on behalf of the Federal Government unconditional gifts of property in aid of any

project or function within" its jurisdiction. 40 U.S.C. § 3175; *see also* 2 GAO, *Principles of Federal Appropriations Law* 6-222 to 6-224 (3d ed. 2006). This authority permits GSA to accept gifts of property for use in buildings that it operates on behalf of other agencies. *See* Memorandum for Bernard Nussbaum, Counsel to the President, from Daniel L. Koffsky, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Use of GSA Authority to Accept Gift of Equipment* at 3–4 (Aug. 3, 1993); *Acceptance of Gifts to Be Used in the White House, the Official Residence of the Vice President, or the Offices of the President and the Vice President*, 2 Op. O.L.C. 349, 351 n.3 (1977). This use of accepted gifts would be an exercise of GSA's power to "operate, maintain, and protect" public buildings. 40 U.S.C. § 582(a). GSA may thus accept employee-donated property such as a menorah or crèche for public display in federal buildings under GSA's jurisdiction.[6]

## III.

We now consider whether the PBS seasonal-decorations policy may be broadened consistent with the Establishment Clause of the First Amendment. The Supreme Court has recognized that the government may employ religious symbols and accommodate religious holidays consistent with long-standing tradition. The display of religiously significant seasonal decorations in federal buildings is in keeping with that tradition and thus is entitled to "a strong presumption of constitutionality." *Am. Legion*, 139 S. Ct. at 2085; *see also id.* at 2092 (Kavanaugh, J., concurring) ("Consistent with the Court's case law, the Court today applies a history and tradition test in examining and upholding the constitutionality of the Bladensburg Cross."). GSA may therefore broaden its seasonal-decorations policy to allow for the display of such decorations.

## A.

The Establishment Clause does not preclude the government from taking cognizance of its citizens' religious practices, but rather prohibits laws "respecting an *establishment* of religion." U.S. Const. amend. I (emphasis added). At the time the Bill of Rights was adopted, the Church of England

---

[6] GSA's gift authority applies only to "unconditional" gifts. 40 U.S.C. § 3175. Your office has not asked us about the meaning of that term, and we do not address it here.

was established by law in Britain and "about half the states continued to have some form of official religious establishment." Michael W. Mc-Connell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2107 (2003) ("*Establishment at the Founding*"). The founding generation, "[f]amiliar with life under the established Church of England," thus "sought to foreclose the possibility of a national church." *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 183 (2012).

The founders also desired to preclude "the national legislature from interfering with, or trying to disestablish, churches established by state and local governments." Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 32 (1998). The state religious establishments that the Founders sought to protect from federal interference took a variety of forms, but they generally involved some combination of financial support for a particular church, state control over religious doctrine, religious compulsion, prohibitions on worship in other churches, the use of church institutions for public functions, and "religious tests" for political participation and public office. *See Establishment at the Founding*, 44 Wm. & Mary L. Rev. at 2131–81. Thus, the concept of a national "establishment" at the time of the Founding did not refer to any government action touching religion, but rather to a distinctive form of support, enforcement, and control of religious faith.

Whatever the ambiguities about what constitutes a law "respecting" an "establishment" of religion, the Supreme Court's decisions reflect that the Establishment Clause permits the government to "publicly acknowledge religion . . . consistent with long-standing traditions and practices of this country." *Religious Restrictions on Capital Financing for Historically Black Colleges and Universities*, 43 Op. O.L.C. __, at *4 (Aug. 15, 2019); *see also* Donald L. Drakeman, *Church, State, and Original Intent* 216–29 (2010) (discussing the uncertainties about the meaning of "establishment" at the time of the Founding). The Court has long recognized that the Establishment Clause "does not say that in every and all respects there shall be a separation of Church and State." *Zorach v. Clauson*, 343 U.S. 306, 312 (1952). Rather, "[t]here is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789." *Lynch v. Donnelly*, 465 U.S. 668, 674 (1984).

The Court has repeatedly upheld the constitutionality of practices that are consistent with this history and tradition. In *Marsh v. Chambers*, 463 U.S. 783 (1983), for example, the Court rejected an Establishment Clause challenge to the Nebraska legislature's more-than-a-century-old practice of beginning each of its sessions with a prayer by its official chaplain, observing that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id*. at 786. In *Lynch*—the first case in which the Court considered a religiously themed seasonal display—the Court relied on *Marsh* to sustain the constitutionality of a display of a crèche that the City of Pawtucket had allowed in a public park. The Court rejected an "absolutist approach" to the Establishment Clause and instead asked whether the display of the crèche "in reality . . . establishes a religion or religious faith, or tends to do so." *Lynch*, 465 U.S. at 678.

Five years later, the Court departed from this historical approach in its fractured decision in *County of Allegheny v. ACLU, Greater Pittsburgh Chapter*, 492 U.S. 573 (1989). Five members of the Court employed a context-driven approach, based on the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), to determine that a municipality's display of a crèche had "the effect of endorsing a patently Christian message," whereas the display of a menorah did not. *County of Allegheny*, 492 U.S. at 601 (majority opinion); *see also id*. at 623–27 (O'Connor, J., concurring in part and concurring in the judgment).[7] The dissenters, led by Justice

---

[7] *Lemon* had attempted to distill the Court's Establishment Clause cases into a three-part test: "First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster an excessive government entanglement with religion." 403 U.S. at 612–13 (internal citations and quotation marks omitted). The test has been frequently criticized by Justices as lacking a constitutional foundation and as incapable of principled application. *See, e.g.*, *Am. Legion*, 139 S. Ct. at 2080 (Alito, J., plurality opinion, joined by Roberts, C.J., Breyer and Kavanaugh, JJ.) ("In many cases, this Court has either expressly declined to apply the test or has simply ignored it. . . . As Establishment Clause cases involving a great array of laws and practices came to the Court, it became more and more apparent that the *Lemon* test could not resolve them."); *id*. at 2081 (cataloguing opinions in which Justices have criticized *Lemon*); *id.* at 2092 (Kavanaugh, J., concurring) ("If *Lemon* guided this Court's understanding of the Establishment Clause, then many of the Court's Establishment Clause cases over the last 48 years would have been decided differently[.]"); *id*. at 2097 (Thomas, J., concurring) ("I would take the logical next step and overrule the *Lemon* test in all contexts."); *id*. at 2101 (Gorsuch, J., joined by Thomas,

Kennedy, criticized this approach as embracing a "jurisprudence of minutiae" and instead would have followed the historical approach of *Marsh* in upholding both displays. *Id.* at 674, 662–68 (Kennedy, J., concurring in the judgment in part and dissenting in part, joined by Rehnquist, C.J., White, J., and Scalia, J.). The passive and non-coercive "acknowledgment of existing symbols," Justice Kennedy maintained, "does not violate the Establishment Clause unless it benefits religion in a way more direct and more substantial than the practices that are accepted in our national heritage." *Id.* at 662–63.

The Supreme Court reached another splintered result in 2005, when it issued the companion decisions of *Van Orden v. Perry*, 545 U.S. 677 (2005), and *McCreary County v. ACLU of Ky.*, 545 U.S. 844 (2005). *Van Orden* upheld the display of a Ten Commandments monument on the grounds of the Texas state capitol, 545 U.S. at 686, while *McCreary County* held unconstitutional Ten Commandments displays on the walls of Kentucky county courthouses, 545 U.S. at 858. Chief Justice Rehnquist's opinion on behalf of four Justices in *Van Orden* gave great weight to history in concluding that the Ten Commandments display was constitutional. 545 U.S. at 686. Even though "the Ten Commandments are religious," he explained, *id.* at 690, Texas's passive display did not violate the Establishment Clause any more than did the decades-old image of "Moses . . . holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze" of the Supreme Court courtroom, *id.* at 688.[8] The Court in *McCreary*

---

J., concurring) ("*Lemon* was a misadventure. It sought a 'grand unified theory' of the Establishment Clause but left us only a mess." (quoting *id.* at 2086–87 (plurality opinion)); *McCreary County v. ACLU of Ky.,* 545 U.S. 844, 890 (2005) (Scalia, J., joined by Rehnquist, C.J., and Thomas, J, dissenting) ("[A] majority of the Justices on the current Court (including at least one Member of today's majority) have, in separate opinions, repudiated the brain-spun '*Lemon* test' that embodies the supposed principle of neutrality between religion and irreligion." (internal citations omitted)).

[8] Justice Breyer—the only Justice who voted with the majority in both cases and writing only for himself—concurred in the *Van Orden* judgment, based on a context-sensitive analysis that weighed what he saw as the display's "predominately secular message" *id.* at 702, the fact that the display had "stood apparently uncontested for nearly two generations," and that removing the display would "exhibit a hostility toward religion that has no place in our Establishment Clause traditions," *id.* at 704. Justice Breyer also cautioned that the Court's various "tests" to date, including *Lemon*, neutrality, and endorsement, were "insufficient," as they could not "readily explain the Establishment Clause's toler-

*County*, on the other hand, used a *Lemon*-based analysis similar to that of *County of Allegheny* to declare the Kentucky displays unconstitutional, based on what the Court perceived as their "predominately religious purpose." 545 U.S. at 881. In dissent, Justice Scalia castigated the usefulness of the *Lemon* test in explaining the "history and traditions that reflect our society's constant understanding of" the words of the Constitution. *Id*. at 889 (Scalia, J., joined by Rehnquist, C.J., and Thomas, J.). "Historical practices," he countered, "demonstrate that there is a distance between the acknowledgment of a single Creator and the establishment of a religion." *Id*. at 894.

In recent years, however, the Court has retreated from these fractured decisions and confirmed the historical approach that is, in our view, more consistent with the Nation's constitutional tradition and the original meaning of the Establishment Clause. In 2014, the Supreme Court relied on history and tradition in sustaining a recent practice of opening board meetings in the Town of Greece, New York with a benediction from designated clergy. *See Town of Greece v. Galloway*, 572 U.S. 565, 570 (2014); *see also id.* at 577, 586 (approvingly citing Justice Kennedy's *County of Allegheny* opinion). The Court asked whether the town's practice "fits within the tradition long followed in Congress and the state legislatures" of beginning sessions with a prayer. *Id.* at 577. The Court concluded that it did, notwithstanding its avowedly religious content and relatively recent historical provenance. *Id.* at 581.

The Court again followed this historical approach in 2019 in rejecting an Establishment Clause challenge to the placement of a Latin cross, owned and maintained by the Maryland-National Capital Park and Planning Commission, at a busy intersection as part of a 1925 World War I memorial. *Am. Legion*, 139 S. Ct. 2067. Writing for the majority, Justice Alito placed that cross within a larger, well-established tradition of using crosses to commemorate soldiers who had given their lives in World War I. *Id.* at 2085–87. Justice Alito also situated the cross within the national tradition of officially acknowledging religion—a practice, he noted, that reflected "respect and tolerance for differing views, an honest endeavor to

---

ance, for example, of the prayers that open legislative meetings, certain references to, and invocations of, the Deity in the public words of public officials; the public references to God on coins, decrees, and buildings; or the attention paid to the religious objectives of certain holidays, including Thanksgiving." *Id.* at 699 (internal citations omitted).

achieve inclusivity and nondiscrimination, and a recognition of the important role that religion plays in the lives of many Americans." *Id.* at 2089 (plurality opinion). "Where categories of monuments, symbols, and practices with a longstanding history follow in that tradition," he continued, "they are likewise constitutional." *Id.* Justices Gorsuch and Thomas differed from the two Justices who joined that part of Justice Alito's opinion in full only in that they would have given even greater weight to history. *See id.* at 2096–97 (Thomas, J., concurring in judgment); *id.* at 2102 (Gorsuch, J., concurring in judgment). And a clear majority of the Justices in *American Legion* rejected the analysis of *Lemon* in favor of one based on history and tradition.[9]

We think these decisions establish that PBS's 2018 policy relied on an overly restrictive constitutional framework. By prohibiting the display of seasonal decorations thought to be "religiously significant," rather than those thought to "typify the secular celebration of the holiday season," PBS relied on the Supreme Court's fractured decision in *County of Allegheny*, and the context-sensitive approach inspired by *Lemon*. PBS Order No. 4200.2, at 1 & nn.2–3. But the correct question is not whether the displays themselves are religiously significant, or whether they satisfy the *Lemon* framework, but rather whether they are the kind of displays that are consistent with the "history and tradition" of this country. *Am. Legion*, 139 S. Ct. at 2092 (Kavanaugh, J., concurring) (citing *Town of Greece*, Chief Justice Rehnquist's *Van Orden* opinion, and *Marsh*).

We think that, in asking whether a seasonal display is consistent with history and tradition, PBS may take a wide-lens approach in seeking historical analogs for a seasonal display—an approach that the Court itself has repeatedly followed. In *Town of Greece*, for example, the Court analyzed a practice of legislative prayer that had begun only 15 years prior. 572 U.S. at 570. But the Court did not ask whether the town's practice of legislative prayer itself was old; instead, it asked rather wheth-

---

[9] *See Am. Legion*, 139 S. Ct. at 2081–82 (plurality opinion) (noting that various considerations "counsel against efforts to evaluate such cases under *Lemon* and toward application of a presumption of constitutionality for longstanding monuments, symbols, and practices"); *id.* at 2097 (Thomas, J., concurring) ("I would take the logical next step and overrule the *Lemon* test in all contexts."); *id.* at 2101 (Gorsuch, J., concurring) (agreeing with the plurality that "*Lemon* was a misadventure" and noting that "not a single Member of the Court even tries to defend *Lemon*" against various criticisms).

er that practice "fits within the tradition long followed in Congress and the state legislatures." *Id.* at 577. Similarly, in *Lynch*, the Court relied on the government's history of acknowledging religion to uphold the constitutionality of a crèche that the town had included in its Christmas display for about 40 years but had purchased only 11 years prior. 465 U.S. at 671. The Court acknowledged that "the crèche is identified with one religious faith," but observed that this was "no more so than the examples" it had upheld previously and that have been part of our Nation's tradition— including faith-specific legislative prayers, displays of religiously themed art in the National Gallery, and religious holidays such as Thanksgiving. 465 U.S. at 674–78, 685–86. And in *Van Orden*, Chief Justice Rehnquist's plurality opinion considered the history of other kinds of Ten Commandments displays on government property—such as a statue of Moses holding the tablets in the rotunda of the Library of Congress's Jefferson Building and a frieze of Moses holding them in the Supreme Court—to uphold a monument that was installed on Texas capitol grounds in 1961. 545 U.S. at 688–89.

This broad analogical approach is reflected in Justice Kennedy's opinion in *County of Allegheny*, which has formed the basis for the Court's now-controlling approach in this area. In it, Justice Kennedy used a wide historical lens to support the constitutionality of the display of a crèche and a menorah—two concededly religious decorations. Such displays fell "well within the tradition of government accommodation and acknowledgment of religion that has marked our history from the beginning." 492 U.S. at 663 (Kennedy, J., concurring in the judgment in part and dissenting in part). The "passive acknowledgment of existing symbols does not violate the Establishment Clause," he concluded, "unless it benefits religion in a way more direct and more substantial than practices that are accepted in our national heritage." *Id.* at 662–63.

## B.

Our Nation's history and traditions, evaluated in light of this approach, make clear that a symbolic acknowledgment of religion by the government is, at a minimum, entitled to "a strong presumption of constitutionality." *Am. Legion*, 139 S. Ct. at 2085. The PBS policy of categorically prohibiting the display of certain "religiously significant" decorations thus is not required by the Establishment Clause.

The historical evidence is overwhelming that a mere public acknowledgment or even celebration of religion is not an "establishment" of religion. Our Founders, including the First Congress—whose practice "is strong evidence of the original meaning of the Constitution," *Fin. Oversight & Mgmt. Bd. v. Aurelius Inv.*, 140 S. Ct. 1649, 1659 (2020)—explicitly acknowledged and celebrated religion. The Constitution itself accommodates the Christian Sabbath in the Sundays Excepted Clause of Article I, Section 7, which does not count Sundays as part of the ten days the President has to return a bill to Congress. Nineteenth-century observers recognized this clause as an implicit recognition that the President would not engage in official business on the Christian Sabbath. *See* Daniel L. Dreisbach, *In Search of a Christian Commonwealth: An Examination of Selected Nineteenth-Century Commentaries on References to God and the Christian Religion in the United States Constitution*, 48 Baylor L. Rev. 927, 974–77 (1996) ("Arguably, Article I, Section 7 constitutionally sanctioned Sunday observances."). The Supreme Court has likewise described the Sundays Excepted Clause as historical evidence "that this is a religious nation." *Church of the Holy Trinity v. United States*, 143 U.S. 457, 470 (1892).

Only one day after it approved the Establishment Clause for submission to the States, the First Congress urged President Washington to proclaim "a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God." *Lynch*, 465 U.S. at 675 n.2. President Washington did so, designating Thursday, November 26, 1789, as a day of thanks. 1 *A Compilation of the Messages and Papers of the Presidents, 1789–1897* 64 (James A. Richardson ed., 1899). President Washington urged devotion "to the service of that great and glorious Being" and unity "in most humbly offering our prayers and supplications to the great Lord and Ruler of Nations." *Id.* Presidents have routinely followed his example in declaring a national day of Thanksgiving, though Congress did not formally recognize it as an official holiday until 1870. *See Lynch*, 465 U.S. at 675.

In like fashion, Article III of the Northwest Ordinance declared: "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 52 n.(a) (quoting Northwest Ordinance of 1787 in footnote of statute providing for

Ordinance to continue in effect). The same week it proposed the Establishment Clause, Res. of Sept. 25, 1789, 1 Stat. 97, 97–98, the First Congress provided paid chaplains to both the House and Senate, Act of Sept. 22, 1789, ch. 17, § 4, 1 Stat. 70, 71; *see also Marsh v. Chambers*, 463 U.S. 783, 787–88 (1983). Congress also has provided for a paid chaplains corps for our military forces ever since the First Continental Congress.[10] The Judiciary Act of 1789 prescribed an oath for Supreme Court justices, federal judges, federal marshals, and clerks of court that concluded with the phrase "So help me God."[11] The oath of office of the President does not include those words, but President Washington is believed to have added the phrase to the end of his first oath, and Presidents have done so by tradition since. *See* John R. Alden, *George Washington: A Biography* 236 (1984); *Newdow v. Roberts*, 603 F.3d 1002, 1018 (D.C. Cir. 2010) (Kavanaugh, J., concurring). Sessions of the Senate and House of Representatives have opened with a prayer since the First Continental Congress did so in 1774. Presidents have proclaimed National Days of Prayer, following the example of the first Continental Congress in 1775.[12] The

---

[10] *See Katcoff v. Marsh*, 755 F.2d 223, 232 (2d Cir. 1985) ("Congress'[s] authorization of a military chaplaincy before and contemporaneous with the adoption of the Establishment Clause is also 'weighty evidence' that it did not intend that Clause to apply to such a chaplaincy." (quoting *Wisconsin v. Pelican Ins.*, 127 U.S. 265, 297 (1888)).

[11] Act of Sept. 24, 1789, ch. 20, § 8, 1 Stat. 73, 76 (oath for Supreme Court justices and federal judges, codified as amended at 28 U.S.C. 453); *id*. § 27, 1 Stat. at 87 (oath for U.S. marshals); *id*. § 7, 1 Stat. at 76 (oath for clerks of court, codified as amended at 28 U.S.C. § 951). The current oath of office for those "elected or appointed to an office of honor or profit in the civil service or uniformed services," including members of Congress but excluding the President, includes "So help me God." 5 U.S.C. § 3331 (derived from Act of Feb. 15, 1871, ch. 53, 16 Stat. 412, 412 (initially codified at Rev. Stat. § 1757, 18 Stat., pt. 1, at 314 (1875)).

[12] *See* Derek H. Davis, *Religion and the Continental Congress: 1774–1789* 84, 90 (2000). In 1952, Congress directed "[t]hat the President shall set aside and proclaim a suitable day each year, other than a Sunday, as a National Day of Prayer, on which the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." Pub. L. No. 324, 66 Stat. 64. President Truman accordingly proclaimed July 4, 1952, as the first National Day of Prayer. Proc. No. 2978 (June 17, 1952), 3 C.F.R. 32, 32 (1952 Supp.). Today the National Day of Prayer is the first Thursday in May. 36 U.S.C. § 119. Presidents have routinely issued other proclamations encouraging citizens to pray on various matters of concern. *See, e.g.*, Proc. No. 9634, 82 Fed. Reg. 42,439, 42,439 (Sept. 7, 2017) ("I urge Americans of all faiths and religious traditions and backgrounds to offer prayers today for all those harmed by Hurricane

Declaration of Independence states that all men "are endowed by their Creator with certain unalienable Rights." And since the age of John Marshall, the Supreme Court has opened its sessions with a plea that "God save the United States and this Honorable Court." 1 Charles Warren, *The Supreme Court in United States History* 469 (1922). Such practices reflect that "[w]e are a religious people whose institutions presuppose a Supreme Being." *Zorach v. Clauson*, 343 U.S. 306, 313 (1952); *Church of the Holy Trinity*, 143 U.S. at 465 ("[T]his is a religious people. This is historically true. From the discovery of this continent to the present hour, there is a single voice making this affirmation."). The Establishment Clause does not, and was never intended, to preclude such a recognition of the religious practices of the people of this country.

The Founding-era practice of acknowledging religion has extended over the length of American history and the breadth of American institutions. Numerous congressional resolutions have recognized the contributions of religion to public life.[13] Presidential inaugural addresses have voiced religious themes.[14] Official state mottoes express religious convic-

---

Harvey . . . . Each of us, in our own way, may call upon our God for strength and comfort during this difficult time. I call on all Americans and houses of worship throughout the Nation to join in one voice of prayer, as we seek to uplift one another and assist those suffering from the consequences of this terrible storm.").

[13] *See, e.g.*, Mormon Pioneer National Heritage Area Act, Pub. L. No. 109-338, § 252(a)(1), 120 Stat. 1783, 1800 (2006) (finding that "the historical, cultural, and natural heritage legacies of Mormon colonization and settlement are nationally significant"); Pub. L. No. 101-104, 103 Stat. 673, 673 (1989) (designating the week of September 24, 1989, as "Religious Freedom Week"; finding that "throughout our Nation's history, religion has contributed to the welfare of believers and of society generally, and has been a force for maintaining high standards for morality, ethics, and justice"); Pub. L. No. 94-95, 89 Stat. 477 (1975) (designating September 14, 1975, as "National Saint Elizabeth Seton Day"; finding that, "through her own life and work and through the work of thousands of women who traced the origins of their religious foundations to her founding of the Sisters of Charity of Saint Joseph of Emmitsburg, Maryland, on July 31, 1809," Elizabeth Seton "made an extraordinary contribution to the religious and moral life of our country as well as to the education, health, and welfare of vast numbers of our citizens").

[14] George Washington made a prayer a part of his first official act as President. Inaugural Addresses of the Presidents of the United States, S. Doc. No. 101-10, at 2 ("[I]t would be peculiarly improper to omit in this first official act my fervent supplications to that Almighty Being who rules over the universe[.]). *See generally id*.; Robert N. Bellah, *Civil Religion in America*, 96 Daedalus 1 (1967).

tions.[15] "[C]ountless" cities and towns across our country bear "names that are rooted in religion." *Am. Legion*, 139 S. Ct. at 2084. And since Congress established it in 1954, our Pledge of Allegiance has stated that we are "one Nation under God."[16]

State laws requiring businesses to close on Sundays date from before the Founding, when they acquired the name "blue laws," perhaps because early instances of them were printed on blue paper. *See* David N. Laband & Deborah Hendry Heinbuch, *Blue Laws: The History, Economics, and Politics of Sunday-Closing Laws* 8 (1987). Such laws continued to be common in the twentieth century. *See* Lesley Lawrence-Hammer, Note, *Red, White, but Mostly Blue: The Validity of Modern Sunday Closing Laws Under the Establishment Clause*, 60 Vand. L. Rev. 1273, 1277–82 (2007). In a trio of 1961 decisions, the Supreme Court upheld Sunday-closing laws against constitutional challenge. *See McGowan v. Maryland*, 366 U.S. 420 (1961); *Two Guys v. McGinley*, 366 U.S. 582 (1961); *Braunfeld v. Brown*, 366 U.S. 599 (1961). Federal, state, and local governments have also recognized—and continue to recognize—a number of annual religious holidays, including Good Friday, Easter, Christmas, and Jewish holy days, as well as Thanksgiving, which at the very least has religious roots even if "despite its religious origins" many understand it "as a celebration of patriotic values rather than particular religious be-

---

[15] *See, e.g.*, *Am. Legion*, 139 S. Ct. at 2084 & n.22 (noting, among other state mottoes, the Arizona motto of "Ditat Deus," or "God enriches,"); *ACLU of Ohio v. Capitol Square Rev. & Adv. Bd.*, 243 F.3d 289, 291 (6th Cir. 2001) (holding that "Ohio's state motto, 'With God, All Things Are Possible,' does not violate the Establishment Clause").

[16] Congress first established the Pledge of Allegiance in 1942, Pub. L. No. 77-623, § 7, 56 Stat. 377, 380, and amended it in 1954 to include the phrase "under God" after "one Nation," Pub. L. No. 83-396, 68 Stat. 249, 249 (currently codified 4 U.S.C. § 4). The Pledge has been upheld against constitutional challenge. *See Sherman v. Community Consol. Sch. Dist. 21*, 980 F.2d 437, 445 (7th Cir. 1992) ("Unless we are to treat the founders of the United States as unable to understand their handiwork . . . we must ask whether those present at the creation deemed ceremonial invocations of God as 'establishment.' They did not."); *see also Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 17 (2004) (reversing a decision of the Ninth Circuit striking down the pledge, *Newdow v. U.S. Congress*, 328 F.3d 466 (9th Cir. 2002), for lack of standing); *Wallace v. Jaffree*, 472 U.S. 38, 78 n.5 (1985) ("O'Connor, J., concurring) ("In my view, the words 'under God' in the Pledge . . . serve as an acknowledgment of religion with 'the legitimate secular purposes of solemnizing public occasions, [and] expressing confidence in the future.'").

liefs." *County of Allegheny*, 492 U.S. at 631 (O'Connor, J., concurring in part and concurring in the judgment, joined by Brennan and Stevens, JJ.).[17] The constitutionality of closing schools and other public institutions on such holidays has been repeatedly upheld by the lower courts.[18]

The use of visual religious symbols in our government likewise dates from the Founding. In 1776, the Continental Congress appointed a committee that included Benjamin Franklin, Thomas Jefferson, and John Adams to design a seal for the new nation. *See* Michael W. McConnell, *No More (Old) Symbol Cases*, 2018–2019 Cato Sup. Ct. Rev. 91, 107; James H. Hutson, *Religion and the Founding of the American Republic* 50 (1998). They originally proposed on one side a scene that included the

---

[17] *See, e.g.*, Act of Mar. 2, 1867, ch. 176, § 48, 14 Stat. 517, 540–41 (declaring that Christmas, along with Sundays, Thanksgiving, and other holidays, would not be counted toward deadlines in federal bankruptcy proceedings); Act of June 28, 1870, ch. 167, 16 Stat. 168 (declaring that Christmas and Thanksgiving would be public holidays in the District of Columbia and would be treated like Sundays for banking purposes); *see generally Lynch*, 465 U.S. at 675 & n.2 (noting early origins and religious nature of the Thanksgiving holiday); Rabbi Joshua Eli Plaut, *A Kosher Christmas: 'Tis the Season to Be Jewish* 41–42 (2012) (recounting the history of public Chanukah celebrations, including lighting ceremonies at the White House); Cong. Research Serv., *Jewish Holidays: Fact Sheet* (updated Dec. 4, 2018), https://fas.org/sgp/crs/misc/R45002.pdf (listing examples of government recognition of Jewish holidays); Fla. Stat. § 683.19 (2020) ("The chief judge of any judicial circuit is authorized to designate Rosh Hashanah, Yom Kippur, and Good Friday as legal holidays for the courts within the judicial circuit."); N.C. Gen. Stat. § 103-4(a) (2020) (listing Good Friday, Yom Kippur, and Christmas—among others—as "legal public holidays"); La. Stat. § 17:2118 (2020) (authorizing school-district staff to "offer traditional greetings" regarding "traditional celebrations in winter," including but not limited to "Merry Christmas" and "Happy Hanukkah"); Tex. Educ. Code § 29.920 (2020) (similar); Tenn. Code § 49-6-1033 (2020) (similar).

[18] *See Koenick v. Felton*, 190 F.3d 259, 266 (4th Cir. 1999) (upholding Maryland statute that provided for public school holidays on both Good Friday and Easter Monday; noting that "[t]his statutory four-day holiday around Easter has been a part of the Montgomery County Public School Calendar for 130 years"); *Ganulin v. United States*, 71 F. Supp. 2d 824, 835 (S.D. Ohio 1999), *aff'd*, 238 F.3d 420 (6th Cir. 2000) (per curiam) (Christmas Day as a legal public holiday does not violate the Establishment Clause); *Bridenbaugh v. O'Bannon*, 185 F.3d 796, 802 (7th Cir. 1999) (upholding Indiana's Good Friday holiday law); *Granzeier v. Middleton*, 173 F.3d 568, 571 (6th Cir. 1999) (upholding Kentucky's Good Friday holiday law); *Cammack v. Waihee*, 932 F.2d 765, 782 (9th Cir. 1991) (upholding Hawaii's Good Friday holiday law); *but see Metzl v. Leininger*, 57 F.3d 618, 624 (7th Cir. 1995) (holding that Illinois's Good Friday school holiday law violated the Establishment Clause).

Eye of Providence—"an adoption of a very ancient symbol of the overseeing God"—and on the reverse, Moses leading the Israelites across the Red Sea—adorned with the words "Rebellion to Tyrants is Obedience to God." *Id.*; Gaillard Hunt, *History of the Seal of the United States* 12–13 (1909).[19] The Great Seal of the United States, adopted both by the Confederation Congress in 1782 and the First Congress in 1789, *see* Act of Sept. 15, 1789, § 3, 1 Stat. 68, 68, likewise employs imagery that, while classical in its origins, points toward a transcendent deity: On its reverse face, the Eye of Providence oversees a thirteen-layered pyramid representing the original thirteen colonies, and it includes the Latin phrase "Annuit Coeptis," which is translated as "He has favored our undertakings." *See, e.g.*, U.S. Dep't of State, *The Great Seal of the United States* 4 (2003) ("*Great Seal*") (available for download at https://diplomacy.state.gov/explore-online-exhibits/the-great-seal/) (last visited Jan. 12, 2021). According to the contemporaneous report of early-American congressional secretary Charles Thomson, the eye and motto were selected to "allude to the many signal interpositions of providence in favour of the American cause." Hunt, *History of the Seal of the United States* at 42. The religious text and imagery of the Great Seal continue to appear throughout American public life—including, for example, on the reverse side of the contemporary one-dollar bill, little-changed since it was adopted in 1935. *See Great Seal* at 13.

The use of religious symbolism extends well beyond the seal. The inscription "In God We Trust" first appeared on the 1864 two-cent coin.[20] It now appears on all American currency.[21] Congress declared it to be the national motto in 1956, Pub. L. No. 84-851, 70 Stat. 732, 732 (currently codified at 36 U.S.C. § 302), and it is inscribed above the main door of

---

[19] We have found no evidence that this shift in design reflected a desire to avoid religious imagery; one historian speculates that the change resulted because the image of Moses was "wholly unsuited to a coat of arms." Hunt, *History of the Seal of the United States* at 10.

[20] U.S. Dep't of the Treasury, *History of "In God We Trust"* (last updated March 3, 2011), https://www.treasury.gov/about/education/Pages/in-god-we-trust.aspx (recounting the history of the inscription on American currency) (last visited Jan. 12, 2021).

[21] *Id.*; *see also* 31 U.S.C. §§ 5112, 5114 (requiring the inscription). The inscription has also been upheld against repeated constitutional challenge. *New Doe Child #1 v. United States*, 901 F.3d 1015, 1022 (8th Cir. 2018); *Mayle v. United States*, 891 F.3d 680, 687 (7th Cir. 2018); *Gaylor v. United States*, 74 F.3d 214, 217–18 (10th Cir. 1996).

Senate and behind the chair of the Speaker of House, *see* Pub. L. No. 107-293, § 1(10), 116 Stat. 2057, 2058 (2002).

Religiously significant decorations have also adorned federal buildings for decades. In the courtroom of the Supreme Court of the United States, a frieze depicts Moses "holding two tablets that reveal portions of the Ten Commandments written in Hebrew," alongside other religious and secular lawgivers. *Van Orden*, 545 U.S. at 688. The Ten Commandments appear as well on gates and doors elsewhere in the Court's building. *Id.* The art collection displayed in the Robert F. Kennedy Department of Justice Building includes enormous Depression-era paintings of many notable secular and religious lawgivers, among them Jesus and Moses. U.S. Dep't of Justice, *The Robert F. Kennedy Building* 72–78 (2009), https://www.justice.gov/sites/default/files/jmd/legacy/2014/06/30/75RFKBuilding.pdf. The building's Great Hall contains a statue entitled The Spirit of Justice, which has two tablets representing the Ten Commandments lying at its feet. *Id.* at 50.

While we have not identified historical sources addressing religiously significant seasonal decorations in federal buildings around the time of the Founding, such decorations are consistent with the Founders' openness to religious practices, use of religious imagery, and accommodation of religious holidays. Certainly, seasonal religious decorations are not new to American public life. Christmas emerged as a widely celebrated holiday in the 19th century, and so too did the public use of Christmas decorations. President Franklin Pierce "put the first tree in the White House in 1856, a tradition that had become established by the 1880s." Penne L. Restad, *Christmas in America: A History* 63 (1995). The Christmas tree undeniably has a religious history and meaning. *See* Greg Dues, *Catholic Customs and Traditions: A Popular Guide* 57–58 (revised ed. 2000) (noting that Christmas trees "preserve . . . rich Christian symbolism: the green of hope at a time of dying, the burning light of Christ at a time of spiritual darkness, and the fruits of paradise"); Michael W. McConnell, *Religious Freedom at a Crossroads*, 59 U. Chi. L. Rev. 115, 188–89 (1992). Christmas was established as a legal holiday in all states and territories between 1836 and 1890. James H. Barnett, *The American Christmas: A Study in National Culture* 19 (1954); *see also id.* at 20 tbl. 1 (describing the dates of legal recognition). As noted, Congress made Christmas a federal holiday in 1870.

The public acknowledgment and celebration of Christmas expanded in the middle and late 20th century. *See* Restad, *Christmas in America* at 156. At regular occasions since the 1960s, for example, an ornate crèche has been displayed seasonally at the White House. *See Allen v. Hickel*, 424 F.2d 944, 945 (D.C. Cir. 1970); Office of the Press Secretary to Mrs. Johnson, Press Release (Dec. 13, 1967), https://www.fordlibrarymuseum. gov/library/document/0018/81556745.pdf (last visited Jan. 12, 2021); *see also* Zelda Caldwell, *The 300-Year-Old Nativity Scene in the White House*, Aleteia (Nov. 29, 2018), https://aleteia.org/2018/11/29/how-the-300-year-old-nativity-scene-in-the-white-house-was-once-banned/ (last visited Jan. 12, 2021). A 2015 White House press release touted the crèche as a "long-standing holiday tradition" that "has sat in the East Room for the holidays for more than forty-five years, spanning nine administrations." *See* Office of the First Lady, The White House, *2015 White House Holidays—A Timeless Tradition* (Dec. 2, 2015), https:// obamawhitehouse.archives.gov/the-press-office/2015/12/02/2015-white-house-holidays-timeless-tradition (last visited Jan. 12, 2021). A 2018 White House press release noted that the crèche would soon be on display that season for its "51st year." *See* The White House, Statements & Releases, *First Lady Melania Trump Unveils Christmas at the White House 2018* (Nov. 26, 2018), https://www.whitehouse.gov/briefings-statements/first-lady-melania-trump-unveils-christmas-white-house-2018/ (last visited Jan. 12, 2021).

The federal government has also displayed the "National Menorah"— a thirty-foot menorah that is erected seasonally on the Ellipse just south of the White House—for decades. President Carter participated in the National Menorah's first lighting in 1979. *See* Kat Eschner, *Why There's A 30-Foot Menorah on the National Mall*, Smithsonian Magazine (Dec. 23, 2016), https://www.smithsonianmag.com/smart-news/why-theres-30-foot-menorah-national-mall-180961553/ (last visited Jan. 12, 2021). Every President since George Bush in 1989 has displayed a menorah at the White House. *See* Jonathan D. Sarna, *How Hanukkah Came To Be An Annual White House Celebration*, Wash. Post (Dec. 4, 2020), https://www.washingtonpost.com/religion/how-hanukkah-came-to-be-an-annual-white-house-celebration/2020/12/04/54960152-364e-11eb-b59c-adb7153d10c2_story.html (last visited Jan. 12, 2021); The White House, *Menorah Lighting*, https://georgewbush-whitehouse.archives.gov/

president/holiday/hanukkah/ (last visited Jan. 12, 2021). Recent Presidents have also officially acknowledged other religious holidays including Diwali and Ramadan. *See, e.g.*, The White House, Statements & Releases, *Presidential Message on Diwali* (Nov. 14, 2020), https://www.whitehouse.gov/briefings-statements/presidential-message-diwali/ (last visited Jan. 12, 2021); The White House, Statements & Releases, *Presidential Message on Ramadan* (May 5, 2019), https://www.whitehouse.gov/briefings-statements/presidential-message-ramadan-2019/ (last visited Jan. 12, 2021); Office of the Press Secretary, The White House, *Statement by the President on Diwali* (Nov. 4, 2010), https://obamawhitehouse.archives.gov/the-press-office/2010/11/04/statement-president-diwali (last visited Jan. 12, 2021). These displays reflect a consistent and ongoing practice that is in keeping with the tradition of accommodating religious holidays established by the Founders.

All of this history and tradition establishes that religiously significant seasonal decorations are entitled to "a strong presumption of constitutionality." *Am. Legion*, 139 S. Ct. at 2085. As Justice Kennedy explained in *County of Allegheny*, the display of such decorations "falls well within the tradition of government accommodation and acknowledgment of religion that has marked our history from the beginning." 492 U.S. at 663 (Kennedy, J., concurring in the judgment in part and dissenting in part). "It cannot be disputed that government, if it chooses, may participate in sharing with its citizens the joy of the holiday season, by declaring public holidays, installing or permitting festive displays, sponsoring celebrations and parades, and providing holiday vacations for its employees." *Id.* at 663. The display of religiously significant holiday decorations has "a longstanding history," *Am. Legion*, 139 S. Ct. at 2089 (plurality opinion), and plainly "comports with our tradition," *Town of Greece*, 572 U.S. at 591–92.

GSA may therefore broaden its policy to allow for the display of religiously significant decorations in federal government buildings, consistent with the Establishment Clause.

## IV.

Your office has also asked us to provide guidance on "when, where, and in what manner" a broadened policy "may or must permit the display

of religiously significant seasonal decorations." While such issues are challenging to analyze without the benefit of a concrete proposal, we offer here general guidance about the considerations GSA should keep in mind if it formulates a broader policy regarding the display of religiously significant seasonal decorations in federal public buildings. Our guidance draws on the foregoing analysis of the Establishment Clause and also touches on the Free Speech Clause.

## A.

We think that the display of a religiously significant seasonal decoration would fall outside the history and tradition canvassed above only if it "'establishe[d] a religion or religious faith, or tend[ed] to do so.'" *County of Allegheny*, 492 U.S. at 662 (Kennedy, J., concurring in the judgment in part and dissenting in part) (quoting *Lynch*, 465 U.S. at 678). Formal establishments of religion, around the time of the Founding, generally involved the official endorsement by the State of a particular sect, together with a variable mix of financial support for a particular church, religious compulsion, restrictions on dissenting forms of worship, the use of church institutions for public functions, and "religious tests" for political participation. *See* McConnell, *Establishment at the Founding*, 44 Wm. & Mary L. Rev. at 2131–81. A seasonal decoration that simply honors and respects the religious traditions of some or many Americans would not come close to having any of the features of a traditional establishment. One cannot "perceive the Archbishop of Canterbury, the Bishop of Rome, or other powerful religious leaders behind every public acknowledgment of the religious heritage long officially recognized by the three constitutional branches of government." *Lynch*, 465 U.S. at 686. These decorations would be entitled to "a strong presumption of constitutionality." *Am. Legion*, 139 S. Ct. at 2085.

But a presumption is not a guarantee, and the Court has surveyed several features of a religious display that might rebut that presumption and tend to establish a religion. First, the display must not "coerce or intimidate" others into religious observance. *Town of Greece*, 572 U.S. at 589; *see also County of Allegheny*, 492 U.S. at 662–64 (upholding a seasonal display in which "[n]o one was compelled to observe or participate in any religious ceremony or activity"). While "[o]ur institutions presuppose a

Supreme Being," they "must not press religious observances upon their citizens." *Van Orden*, 545 U.S. at 683 (plurality opinion).

A passive symbolic display in a federal public building is hardly likely to coerce or intimidate observers. Any "[p]assersby who disagree with the message conveyed by these displays are free to ignore them, or even to turn their backs, just as they are free to do when they disagree with any other form of government speech." *County of Allegheny*, 492 U.S. at 664 (Kennedy, J., concurring in the judgment in part and dissenting in part). When the Supreme Court has deemed school prayer to violate the Establishment Clause, the Court has done so on the premise that the recitation of a prayer during an official school event effectively coerced the participation of the children who were present. *See, e.g.*, *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310–13 (2000); *Lee v. Weisman*, 505 U.S. 577, 592 (1992). In contrast, "[o]ur tradition assumes that adult citizens, firm in their own beliefs, can tolerate and perhaps appreciate a ceremonial prayer delivered by a person of a different faith." *Town of Greece*, 572 U.S. at 584. We think a stronger assumption is warranted for seasonal displays in federal public buildings, which are even more passive than communal prayers, and whose principal audience would be adult federal employees. *See Van Orden*, 545 U.S. at 691–92 (plurality opinion); *id.* 702–03 (Breyer, J., concurring).

A second feature that might tend to establish religion is a systematic preference for a particular faith—or a policy that systematically discriminates against one. GSA should ensure that the practice of displaying such decorations "over time is not 'exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" *Town of Greece*, 572 U.S. at 583 (quoting *Marsh*, 463 U.S. at 794–95)); *see also County of Allegheny*, 492 U.S. at 664 (Kennedy, J., concurring in the judgment in part and dissenting in part) (noting that there was no "realistic risk that the crèche and the menorah represent an effort to proselytize or are otherwise the first step down the road to an establishment of religion"). If an agency, for example, "chose to recognize, through religious displays, every significant Christian holiday while ignoring the holidays of all other faiths," there could be concern that the religiously significant displays would represent an "unmistakable and continual preference for one faith." *County of Allegheny*, 492 U.S. at 664 n.3 (Kennedy, J., concurring in the judgment in part and dissenting in part). But a decision to accommodate the

faith of Christian workers by honoring Christmas—or another seasonal religious holiday—is no more likely to violate the Establishment Clause than the long-established practice of making such occasions public holidays in the first place.

Avoiding systematic preference or discrimination does not mean that seasonal decorations cannot be associated with a particular faith or school of religious thought. Our tradition does not require the religious symbol in question to be "nonsectarian or not identifiable with any one religion." *Town of Greece*, 572 U.S. at 578. The religious acknowledgments we have surveyed have routinely been linked to a particular faith or philosophy. Legislative prayer is often explicitly Christian. *Id.* Sunday-closing laws, and the Sundays Excepted Clause reflect an attempt to accommodate the Christian Sabbath. Even appeals to a generic "God" necessarily reflect monotheism. *See id.* at 582 (citing *McCreary County*, 545 U.S. at 893 (Scalia, J., dissenting)). Likewise, many of the national holidays that our country has traditionally recognized or accommodated are associated with particular faiths, such as Christmas. A practice of recognizing the religious observances of Americans does not tend to establish a religion, so long as "the practice over time is not 'exploited to proselytize or to advance any one,'" or "disparage any other, faith or belief.'" *Town of Greece*, 572 U.S. at 583 (quoting *Marsh*, 463 U.S. 794–95).

Still, a new policy permitting the use of religiously significant seasonal decorations will more clearly avoid any constitutional questions if it leaves room for religious inclusion—a principle that springs naturally from the concept of nondiscrimination and the traditions we have described. In *American Legion*, for example, the Court described the history of legislative prayer as reflecting "respect and tolerance for differing views." 139 S. Ct. at 2089. Similarly, in rejecting the proposition that the Town of Greece had "contravened the Establishment Clause by inviting a predominantly Christian set of ministers to lead the prayer," the Court observed that the town had "made reasonable efforts to identify all of the congregations located within its borders and represented that it would welcome a prayer by any minister or layman who wished to give one." *Town of Greece*, 572 U.S. at 585. As described above, the government's practice in the area of religious holidays and decorations has also honored the diversity of American faith and culture—from the official recognition and accommodation of a range of holidays to the celebration of those

25

events with ritual and symbol on government property. A revised seasonal-decorations policy would be most likely to honor these traditions if it similarly makes an "honest endeavor to achieve inclusivity and nondiscrimination." *Am. Legion*, 139 S. Ct. at 2089.

We hasten to add, however, that fidelity to the Establishment Clause does not require religious quotas. In *Town of Greece*, the Court rejected any such requirement of "religious balancing," observing that "[s]o long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers." 572 U.S. at 585–86. Nor does the Establishment Clause require an agency to display secular symbols alongside religious ones—any more than a legislature need balance ceremonial prayer with secular acknowledgments. *See Barker v. Conroy*, 921 F.3d 1118, 1131 (D.C. Cir. 2019) (rejecting the contention that the Establishment Clause requires a legislature to "allow secular as well as religious prayer"). As we have discussed, our tradition is replete with instances in which the government has employed religious symbols associated with only a single faith or religious philosophy. A display of a single decoration associated with one faith would not, for that reason alone, violate the Establishment Clause. The Establishment Clause does not require that an agency display Frank Costanza's Festivus pole—or some other decoration associated with any particular faith or philosophy—alongside every crèche or menorah. Instead, it gives agencies significant discretion in selecting displays that are reasonably calculated to honor the broader American tradition, and to improve the morale of federal employees.

## B.

Your office has also asked us the degree to which the PBS policy must allow individual employees to display their own religiously significant seasonal decorations. The 2018 PBS policy uses the passive voice to state: "seasonal decorations that are 'religiously significant in nature' . . . must not be displayed in public areas of buildings." To the extent that this policy forbids private, employee-sponsored religious seasonal displays in public areas, it would raise concerns under the Free Speech Clause of the First Amendment in some applications.

The display of seasonal decorations by the government in federal buildings would generally be government speech, which is not limited by the

Free Speech Clause. Within limits (like the Establishment Clause), the government "is entitled to say what it wishes," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995), and may choose to fund only certain viewpoints, *see, e.g.*, *Rust v. Sullivan*, 500 U.S. 173, 194 (1991); *Regan v. Taxation With Representation*, 461 U.S. 540 (1983). The Supreme Court applied this principle in *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009), in which a religious organization called Summum challenged the city's refusal to place a monument to the Seven Aphorisms of Summum in a public park along with other permanent, privately donated displays, including a Ten Commandments monument. The Court rejected this challenge, ruling that "the monuments in Pleasant Grove's Pioneer Park represent[ed] government speech" and that the city was therefore free to choose which monuments it would accept and display. *Id*. at 472.

In some circumstances, however, the display of seasonal decorations by government employees in the workplace would be private speech protected by the First Amendment. When the government establishes a forum for private speech, even on government property, the government may become subject to free-speech constraints. The Court has long recognized "that members of the public retain strong free speech rights when they venture into public streets and parks," which are "held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id*. at 469 (quotations and citations omitted). In these "traditional" public fora, while "[r]easonable time, place and manner restrictions are allowed," the government may not restrict speech on the basis of viewpoint and may restrict speech on the basis of content only to the extent necessary to achieve a compelling government interest. *Id*.

The same rules may apply to areas "designated" by the government as public fora for expressive activity; the government need not keep such fora open indefinitely, but as long as it does, these rules apply. *Id*. at 469–70; *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). A "nonpublic" government forum, meanwhile, is a government "space that 'is not by tradition or designation a forum for public communication'" in which "the government has much more flexibility to craft rules limiting speech." *Minn. Voters Alliance v. Manksy*, 138 S. Ct. 1876, 1885 (2018) (quoting *Perry*, 460 U.S. at 46); *Cornelius v. NAACP Legal*

*Defense & Educ. Fund., Inc.*, 473 U.S. 788, 802 (1985).[22] Such fora may be "limited to use by certain groups or dedicated solely to the discussion of certain topics." *Summum*, 555 U.S. at 470 (citing *Perry*, 460 U.S. at 46 n.7); *Cornelius,* 473 U.S. at 806. In a nonpublic forum, the government may not restrict speech on the basis of viewpoint, and even subject-matter limits "must be 'reasonable in light of the purpose served by the forum.'" *Cornelius*, 473 U.S. at 806; *see also Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 122 (2001) (Scalia, J., concurring).

The First Amendment thus imposes some constraints on the government's discretion to restrict religious expression in a forum it has created for speech. Restricting speech because it is religious generally constitutes viewpoint-based discrimination and thus would be unconstitutional in any type of forum, public or nonpublic. *See Good News Club*, 533 U.S. at 107–12 (relying on *Rosenberger* and *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)). And even if such a restriction were not viewpoint-based, subject-matter limits on religious expression would be unlikely to be reasonable in a nonpublic forum that is generally open to nonreligious expression. *See, e.g.*, *Good News Club*, 533 U.S. at 122 (Scalia, J., concurring); *Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1215 (9th Cir. 1996) ("We conclude that it is not reasonable to

---

[22] The Court has sometimes referred to this entire third category of fora as a "limited public forum." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001); *id.* at 121 (Scalia, J., concurring); *Rosenberger*, 515 U.S. at 829. In a recent case, however, the Court suggested that a "limited public forum" may be a distinct category from a "nonpublic forum." *See Walker v. Texas Div. Sons of Confederate Veterans*, 576 U.S. 200, 216–17 (2015); *see also Cornelius*, 473 U.S. at 804 (suggesting that a "limited" public forum was a type of "designated" public forum). The Court in *Walker* described a "limited public forum" as one in which the government has affirmatively "reserv[ed a forum] for certain groups or for the discussion of certain topics.'" *Id.* at 215 (quoting *Rosenberger*, 515 U.S. at 829). It then described a "nonpublic forum" as one "'[w]here the government is acting as a proprietor, managing its internal operations.'" *Id.* (quoting *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). The courts of appeals have picked up the distinction drawn in *Walker*. *See Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 426–27 (5th Cir. 2020); *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Ass'n, Inc.*, 942 F.3d 1215, 1237 & n.5 (11th Cir. 2019). Given that we do not address here any particular factual scenario, we do not address any distinction there might be between a "limited public forum" and a "nonpublic forum"; in both fora, speech restrictions must be reasonable and viewpoint-neutral. *See, e.g.*, *Freedom from Religion Found.*, 955 F.3d at 426–27.

allow employees to post materials around the office on all sorts of subjects, and forbid only the posting of religious information and materials."); *Fiedor v. Fla. Dep't of Fin. Servs.*, 440 F. Supp. 3d 1303, 1313–14 (N.D. Fla. Feb. 24, 2020) ("Banning use of a bulletin board . . . for religious content, when the same content would be permitted if not religious," violates the Free Speech Clause of the First Amendment). The government does have an interest in avoiding violations of the Establishment Clause, *see Good News Club*, 533 U.S. at 112–13, but nothing in the Establishment Clause requires excluding private religious expression from a government forum, *see Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–63 (1995) (summarizing cases).

Certain spaces in a government building—such as a lobby, an employee common area, a bulletin board, or interior walls—could in some circumstances be nonpublic fora for the private speech of government employees. *See, e.g.*, *Preminger v. Principi*, 422 F.3d 815, 824 (9th Cir. 2005) (concluding that a Veterans Affairs long-term nursing facility is a nonpublic forum, because the government did not "expressly dedicate[] the property for expressive conduct"); *Tucker*, 97 F.3d at 1216 (treating cubicles and office doors of a state education building as nonpublic fora). Other government spaces could even be public fora. *See, e.g.*, *Chabad-Lubavitch v. Miller*, 5 F.3d 1383, 1388–91 (11th Cir. 1993) (treating the rotunda of a state capitol as a public forum and holding unconstitutional the exclusion of a menorah from that space). The PBS policy does not define the terms "public space" or "public area." If it did bar the display of religiously significant decorations by a federal employee in a government forum for private speech, then the policy could raise the First Amendment problems described above. GSA may wish to keep these concerns in mind in formulating a revised PBS policy.

## V.

GSA may, consistent with fiscal law and the First Amendment, broaden its policy governing the purchase and display of seasonal decorations in the public spaces of federal properties to allow for the display of religiously significant seasonal decorations that are reasonably calculated to improve employee morale. Religious seasonal displays fall within the traditions of our country and do not, without more, contravene the Establishment Clause. The PBS policy forbidding "religiously significant"

displays is not required by the Establishment Clause. In certain applications, the PBS policy may raise questions under the Free Speech Clause, if it prohibited employees from displaying religious decorations in a government forum for private speech.

HENRY C. WHITAKER
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*